The Basic First and Second Issues raised in our brief are both procedural and evidentiary issues and are both subject to the Abusive Discretion Standard. The arbitrator in this case did not conduct a fair trial. He did not fairly and even-handedly apply to the Workers' Compensation Commission Rule 7030.2 of C.3 and Section 12 of the Workers' Compensation Act. On behalf of the appellant who is seeking a decision from this honorable court to vacate the order and remand the case for a new trial. Now the basic facts of the case, Mr. Lewis was a hostile driver, meaning he worked with Parsec at a freight yard where cargo was brought in by truck on chassis with these cargo boxes that fit on the back of a semi-tractor trailer. The chassis and the cargo boxes are stored in various spots on the yard and then they're brought out to be loaded by a crane from the chassis to the train car, the train car chassis. So Mr. Lewis, as a hostile driver, had the job of driving a hostile, which is like a small tractor. It's not big enough or powerful enough to haul the tractor trailer on the road. It's just big enough and strong enough to transport one of these chassis with a cargo box from where it's slotted in the freight car to where the crane will then lift the cargo box off and put the cargo box on the train chassis. So this Monday, March 4th of 2008, the appellant Lewis was operating a hostile and he brought the cargo box and the chassis still attached to the hostile in the right position for the crane to lift the cargo box off and put it on the train. And when the crane lifted the cargo box, for some reason it didn't cleanly lift off the chassis and so the chassis and the hostile cab were both lifted and the cargo box were about one to three feet off the ground. And then the hostile cab and the chassis fell back to the ground. Mr. Lewis was in the cab, the hostile, and he struck his knee on the doorframe. He struck his left knee on the doorframe on the left side. So it was an admitted accident. That's not really the problem here. Mr. Lewis was treated at St. Joseph Hospital of Joliet and by Dr. Kukla. The diagnosis was contusion and subluxation of the patella. Subluxation means the patella was out of alignment by stretching the patellar tendon in the extensor muscle at the front of the thigh. So there was a three-month course of physical therapy from March to June of 2008 under the supervision of Dr. Kukla. The employer engaged an independent examiner in Brody. He saw Mr. Lewis for the first time on May 14th, and he agreed with the diagnosis. He agreed that physical therapy was the right course of treatment for this individual. He had some recommendations for a different style of physical therapy that had been applied, but he supported the idea that physical therapy was the right treatment. He also opined that there was nothing in this particular injury that could be cured by an arthroscopic surgeon. So then another month of physical therapy was done. On June 17th, 2008, Dr. Kukla reported that the subluxation was resolved. So physical therapy had been effective to tighten up the extensor mechanism of the patellar tendon and get that patella back on the right track, which was the main objective of the therapy. And then Kukla reported and recommended that the claimant goes to Triance Regular Duty. Kukla qualified that by saying he wasn't predicting that this would necessarily be a satisfactory placement, but it's really time to try. So that's where the controversy begins. The claimant did not try to move ahead and then he ends up being referred to doctors at Ithaca? Ithaca. Well, that's his own choice. Arbitration transcript page 26 and 27. He chose Ithaca and went there just once, July 1st. Ithaca recommended arthroscopic surgery. Ithaca, in his notes of that day, indicates that he didn't really have a specific objective, a specific pathology he wanted to address. He said that, you know, looking at the MRI scan, he looked at the same MRI as the other doctors, and he, Ithaca, found no clear evidence of any liver or carcinogenesis, as the petitioner's exhibit said. So he didn't really find evidence on imaging or something to fix arthroscopically, but he recommended a kind of an exploratory... Because he also felt that because of the pain and swelling, he found that the obvious swelling in the complainant had not improved with conservative treatment, correct? Well, he thought the individual hadn't improved enough to justify... Well, he felt that the claimant hadn't improved, so he thought he would do a surgery to try and identify something, even though there was nothing on the MRI scan to fix. And as it turns out, ultimately, the commission believed him over Rohde, correct? Is that sort of the bottom line? Rohde and Kupala. Right. Over Rohde and Kupala. And, you know, that's really our final issue, as put before you. It's against the manifest way of the evidence for the commission to have believed this one doctor, Ithaca, simply wanted to do a fishing expedition, this individual's need, over Rohde and Kupala, who consistently corroborated each other that this is basically a stretch of the patella tendon and the extension mechanism. Physical therapy is the way to fix it. There was nothing to fix surgically. And they both also recommended a steroid injection into the knee, which would have addressed that swelling. The claimant decided not to take this steroid injection because he thought that, since he's a diabetic, it would somehow be harmful to him. But there was no rational basis. There was no medical opinion to support that. It was just something he thought. Well, I guess he doesn't have to take an invasive treatment like that. But it is kind of unreasonable that he would reject the simple and less invasive treatment of an injection and instead try to seek an arthroscopic surgery without even trying the injection first. So to that extent, no, conservative means were not exhaustive. Now, Rohde saw the claimant for the second time on August 8. And at that time, he recommended, like Kupala, that the individual should try his regular work. There was a letter by Cheryl Tippett that showed that she had mailed this to the Claimant's Council on August 25, 2008. I also want to have David on the motion that we have from Cruz to show that Tippett had indeed mailed the letter to the office of the Claimant's Council. How do you respond to this? Obviously, if you should, you've emphasized it doesn't necessarily stand or fall based on Rohde and Itikhar. Dr. Kupala's treatment and opinion obviously supports the claimant. However, isn't it also true that on the claimant's first visit to Dr. Kupala on April 17, 2008, the doctor clearly noted the claimant might be a candidate for surgery if the symptoms were not improved through physical therapy? And the argument of your opposing counsel is going to be that's precisely what they did. They followed Kupala because he said if it doesn't improve under conservative treatment, he might be a candidate for physical, for surgery. So doesn't it arguably, can't you turn around and say it supports the surgery, the need for surgery here? But then if you follow through Kupala's reports, he also sees the individual May 16 and June 17. On June 17, now he's got a change in his objective findings. The change in the objective findings in June is now it tells us tracking power. That proves that physical therapy really did have a real effect. And Kupala at that point, June 17, is not recommending surgery. He's recommending that the fellow try his work. So that's my response, that if you follow through, Kupala did do the physical therapy, or rather ordered it done, had it done, and found it had a good effect. And there's objective proof of that. And then he recommended the fellow go back to work instead of having the surgery. So, yeah, I'm saying that Kupala and Rode were on the same page. And Iftikhar was the one who was not on the same page with the other two doctors. That's why the conditions against the manifesto is the evidence on the medical issue. Now, what about the procedural? I'm not spending all your time on the medical. What about the procedural issue? Procedural issue. Well, the claimant's attorney filed his 19-page petition and presented it to the arbitrator on September 15. He was assigned a trial date of September 30. He did not send a completed request for hearing form to the employer's counsel. He conceded that point. Rule 7030.20C3 requires that a party seeking hearing, it could be a petitioner or a respondent seeking a hearing, must tender to the other party 15 days in advance of trial to complete a request for a hearing form. Now, counsel for the claimant didn't do that. He didn't submit any request for hearing form until the day of trial and then completed it right there in the courthouse and submitted it then. So he did disclose in advance the specifics of what he was claiming in terms of dates of temporary federal disability, wages and rates, amounts of money he thought his client was entitled to. So this could have been cured, easeled. And I suggested that to the arbitrator on the record at the very start of the hearing. Just continue the case over to October 24th of that year. Could have exchanged the exhibits on that date. Could have exchanged the request for hearing on that date. So you're acknowledging you were well aware of the issues that were presented at the arbitration hearing. You're conceding that. Well, at the time we stepped down to the trial, yes. But I only found out about it that morning. Likewise, the claimant's counsel objected to the submission of the second voting report. He said it hadn't been disclosed 48 hours prior to trial. It was reported in Section 12. Well, we did have evidence of mailing 35 days in advance. But there was a dispute whether the letter had been received, the letter with the report. So if the arbitrator were to continue the case to October 21st or 24th, then that would have been summed. Because he gave a copy of Rody's second report to Mr. Capron right there at the courthouse on September 30th. He would have ample time to review it, decide whether he wanted to challenge any of the opinions. We could have gotten even an evidence deposition by October 21st or 24th. The arbitrator excused the claimant's not disclosing the issues, her request for a hearing form. But he didn't allow the respondent, the employer, to have an opportunity to cure the objection to the Rody report, even though we have evidence of substantial compliance. And when the claimant offered into the record of Iftikhar, the examining doctor that the claimant chose, the arbitrator allowed Iftikhar's reference into evidence over the same Section 12 examination, excuse me, over the same Section 12 objection that the claimant had disclosed the Iftikhar reference to the respondents or the importer's counsel. So the way the arbitrator conducted the hearing, he applied the 48-hour rule in Section 12 against the respondent, but not against the petitioner. Even though the respondent had evidence of substantial compliance and the petitioner didn't offer any evidence to show when or where he had mailed the Iftikhar reference in advance of the hearing, he just said he had mailed it to the adjuster. Also, there was no medical report attached to the 19B petition, so the claimant didn't cover that disclosure issue by what should be, according to the rule, and according to the 19B form, a mandatory thing of attaching a medical report. That wasn't done in this case. The 19B petition was filed, but nothing was attached to it from the doctor stating the claimant couldn't be at work or why he couldn't be at work. Did you raise any objections to the form of the claimant's motion on September 15th when the petition was heard and presented? Right, page 51, yes. Okay. So these errors, one compounding the other, made for a biased product, and that's why we're arguing that the commission abused its discretion in this case, and because of the abuse of discretion, in the way the trial was conducted, the decision and opinion of the arbitrary commission should be vacated, and the case be remanded for a new trial. And I think I've already covered, in response to questions, my thoughts on the decision being against the manifest way of the evidence on the medical points, so I'll defer to the claimant's counsel at this point unless there's any further questions. Good morning, Your Honor. May it please the Court, my name is Daniel Capron, and I represent Brian Lewis. Mr. Newman. I am reminded of the famous role played by Claude Grant in Casablanca. I thought you were going to say the invisible man at the hearing. Well, he was shocked to see that Gail was involved. Mr. Newman claims that his client was surprised and disadvantaged by the way that this procedure unfolded. So I just want to recount for you, in my own words, how that went down. Mr. Brian Lewis's PTD benefits were cut off in the wake of a Section 12 examination that took place on August the 8th. I filed a 19B petition on August the 19th, and yes, I did follow the proper procedure, and I motioned it up for a September 15th status call. Now that's quite a gap, and yet, seemingly, the respondent did not. When we appeared at the status call on September the 15th, we secured a trial date of September the 30th. That's no accident. That was the farthest out trial date. During that site, I wasn't trying to ram anything through or to catch anybody at a disadvantage. Now, I would have been perfectly within my rights to remain mute for the next however many days it was until the 30th of September and show up with my client and put my case on, but I didn't. I called the then-respondent's counsel, Martin Spiegel. I said, Marty, we've got a trial date on this case. He says, I'm no longer on it. Really, who is? Bob McDermott, Mr. Newman's partner. Instead of remaining mute, I sent an email to Mr. McEnroski, which is in the record. It wasn't merely a cautionary email of one line saying, hey, we're set for trial on September 30th. Be there or beware. I told him what the nature of the dispute was. I was under no obligation to do so. I told him exactly what it is that was going on. His response? Nothing. No response whatsoever. If all of that is correct, and I don't know that anybody has been disputed, how does that relieve the obligation to file a completed request for hearing prior to the date of the hearing? Because, first of all, I don't believe that that obligation exists in a 19B petition. 19B petitions, petitions for immediate hearing, the rules cover that in Section 7020.80. And, by the way, this is an American way of keeping track of these rules. It's rather bothersome, but that's neither here nor there. So you're saying we're not going to get the prejudice because your position is not required. It's not required. It's not required. That's position number one. It is absolutely not required within the rules. Number two, even if it was required, Mr. Newman is trying to elevate this to the jurisdiction as if it's some kind of a statute of limitations, as opposed to a commission rule that has a purpose attached to it. The purpose being to make sure that both parties are on notice as to what the nature of the dispute is. Now, Mr. Newman gets up there and he talks about, well, average weekly wage and all that other stuff. If you look at the request for hearing form that was ultimately attached to the record at the time of the hearing, which, although Mr. Newman did not sign up for choices, right, he did go on the record and say, yes, that correctly recites the issues that are at dispute. None of those other things were at dispute. Accident, average weekly wage, age, marital status, past medical expenses, not at dispute. So you're taking our response. You're saying it's not required, and if it is, really, he wasn't prejudiced because most of those matters were not at dispute. Not in the slightest. Not in the slightest. So there was no response to my efforts to alert Mr. McEnroe that he had a freight train headed for him. No response whatsoever until we get right to the trial, and then he shows up like Claude Rains and said, I'm shocked, shocked to see this case going ahead. Now, in his brief, Mr. Newman characterizes this as trial by ambush. Your Honors, an ambush is not when you tell your opponent what's about to happen. I invited him into my team's club, and I basically told him the play that I was going to call. Now, the only other procedural issue that's attached to this case is the exclusion of Dr. Roney's second report. And I just want to comment for a minute on that. Mr. Newman makes reference to the so-called 48-hour rule. And I say so-called because there's really nothing to sort. The 48-hour rule represents the drop-dead deadline point by which it must be disclosed. But the statute says as soon as practicable. So they really should have gotten this report to me ahead of time, and they didn't. Now, okay, maybe the adjuster mailed it. I think I've got some pretty compelling evidence that I never received it. If you read the content of my e-mails, I'm telling them that I don't have this report. And yet, they still don't send it to me. They still don't give it to me until the very morning of trial. So that is something that was problematic to the arbitrator, and he was proper to exclude them. I'll also point out that I also objected to the admission of the report on a hearsay basis. And that's rather overlooked in the briefs. I didn't just say, I object 48-hour. I said, I object, this is a hearsay document. And the document was excluded from evidence. So that should not have come in. I would only add, relative to my opponent's characterization of Dr. Iftikhar's prescription for a diagnostic arthroscopy, he equates a diagnostic arthroscopy with, and these were his exact words, I wrote them down, a fishing expedition. It's not a fishing expedition. It's a diagnostic arthroscopy. And as you pointed out, this is consistent with what Dr. Krupala has predicted would be the case. Even by the time we get to Dr. Krupala's June visit with the petitioner, where he's saying, I think you should attempt to return to work, I think the doctor's exact words were, I don't think it's going to be successful. I don't predict that this is going to be successful. So you're saying Krupala never really suggested at all time that surgery was under no circumstance going to be necessary. Correct. That was always in Dr. Krupala's playbook. He just hadn't gotten there yet. But clearly, in the mind of Dr. Krupala, as late as June, Brian Lewis was still having problems with that knee. And Dr. Krupala felt that perhaps additional physical therapy would be warranted. Perhaps a cortisone injection might be warranted. But by no means were we at MMI at that point. Now, even with this, the commission, properly in my view, modified the arbitrator's decision to cut out that chunk of TTT in between the June visits with Dr. Krupala, where he issued the trial release to return to work, and Dr. Ishnikar's visit of July 2nd, where he affirmatively said that the petitioner could not. So why was the delay so essential to the defense? Why was it so imperative that they get this delay? Well, according to their brief, and I was very careful to write this down, they had four reasons. Number one, to analyze the issues as if that couldn't have been done before September 30th. They'd been on a case for over a month. Number two, to confer with the employer. Same thing. They could have done that earlier. Number three, to pursue the treatment options that had been identified by Dr. Brody, as if to suggest that my client was somehow obligated to pursue that course of medical treatment and to get a cortisone injection, which subjectively he was fearful of. I know of no provision in the law that would have obligated him to do that. And then finally, they needed more time so as to be able to explore the possibility of a light-duty return to work. Well, if they didn't have light-duty when Brian Lewis was holding a light-duty restriction, what makes them think that they're going to have light-duty available when he's holding a no-work restriction and their doctor apparently says full duty? It's nonsense. The reason why they wanted to continue is because they knew they were in the trick bag on the $48. That's why they wanted to continue. So that's what brings us here today. Sadly, three years later, but it is what it is. The commission, if this is an abusive discretion standard as it relates to the procedural aspects of this, by no means is this an abusive discretion. And as to the medical aspects, it's manifest. So don't view it as a difficult case. And if there are no more questions, I have nothing else to say. Thank you. Mr. Newman, how does it feel to be referred to as Claude Rains? Well, I was just thinking, you know, if he was the invisible man, that would be a really great superpower to have. The question is, what role was he playing at the hearing? So to respond a little bit to what Mr. Capron said about the rules, I mean, Rule 72 of 180 is the rule that defines 19B procedures. It does explicitly in subpart B, paragraph 2, require that a medical report detailing why the individual should be off work and who supports that must be attached to the 19B petition. That was not complied with here. Does the arbitrator have any discretion? Well, you know, I think he abused his discretion. Did he have discretion? I don't think he had the discretion to hold this hearing on this particular day because of the violations of 7020.80 and because of the violations of the rules pertaining to And it doesn't make any difference what the respondent knew about what was going on. It's just simply the dots were done. Well, sure. I mean, I don't want to elevate formal or substance, but, yeah, the forms of work Isn't that what you're doing? Excuse me? Isn't that what you're doing? No, because the forms are there for a reason. The individual seeking a hearing under 19B has to disclose what doctor is supporting the 19B petition. When he files the petition, that wasn't done in this case, is an important guess because that's how the employer gets to know what the evidence against him is going to be and figures out how to respond. As to the rule pertaining to the request for hearing form, it does specify the dates that the individual is seeking temporary total disability benefits for. That's not required in the 19B. It is a difference. It's an important difference. Yes? When do you say that you first learned that the claimant's attorney had not received the report? Well, I think that there's an e-mail from another fellow in our office that was on That date's kind of important. You ought to know it right now. Excuse me? That date is kind of important. It was the Friday before the hearing. The hearing was on a Tuesday, so it was on the 26th. Another fellow from our office got out an e-mail from Mr. Capron explaining that he didn't get the report. That's what he said. That's what he said at the time. It seemed like kind of a head-scratcher because when we looked at the file, it did sound like it was on the 5th, so why didn't he get there? I don't know, but we had substantial compliance, and I think that counsel, Mr. Capron, noticed that he'd also raised a hearsay objection to the Brody report. When I did make the proposition of the arbitrator proposal, we would obtain an evidence deposition of Brody to cure those objections. That should have been granted. So, as to Dr. Kuechler's report of June 17th, which I think is kind of crucial here, he does not say that he recommended surgery at that point. He says that he still thinks Bryant needs some physical therapy for quad strengthening, which is the essential mechanism that Dr. Brody also thought needed strengthening. Kuechler did offer Mr. Elizabeth a cortisone injection, which she refused, so Kuechler gave him a prescription for Molotovic and would like to perform a trial of full duty. He examined the work responsibilities as a crane operator, and it doesn't require him to climb a squat at all. As a driver-squatter, it does require him to squat and climb a little bit. He says he doesn't really predict if Bryant's going to be able, but he would like to see what he's capable of, so he filled out the status of the trial of full duty. He predicted that he's not going to be capable of doing it if he needs some more physical therapy, but he wanted to find out exactly what Bryant couldn't do so he could get the physical therapy right. And he said that the refusal of the cortisone injection does make it a little bit more difficult, but he thinks that the return to work full duty, if he's trying it, is the next step. And he says Bryant will follow up in a month to see how he's doing and see if he's still making progress with receiving a physical therapy, possibly with a cortisone injection. He did say at that point, June 17th, that surgery was in his range of considerations for what Bryant needed at that point. That's why he's on the same page with Dr. Brody on that issue. Thank you. The court will take the matter under advisory for disposition. Clerk, please call the next case.